**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                                       |   |                        |
|---------------------------------------|---|------------------------|
|                                       | * |                        |
| ENDOSURG MEDICAL, INC., *et al.*      |   |                        |
|     Plaintiffs,                       | * |                        |
| v.                                    | * | Case No.: GJH-14-2827  |
| ENDOMASTER MEDICAL, INC., *et al.*    |   |                        |
|                                       | * |                        |
|     Defendants                        | * |                        |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

This dispute arose after one of Plaintiffs' employees resigned, started a competing business, and hired several of Plaintiffs' employees. The former employers, Plaintiffs MedServ International, Inc., EndoSurg Medical, Inc., and EndoCure Technologies, Inc. have brought this action against Defendants EndoMaster Medical, Inc., Tommy Leung, Paul Au, and Cathy Young for breach of contract, tortious interference with employment and business relationships, violations of the Maryland Uniform Trade Secrets Act, violations of the Lanham Act, trademark infringement, fraud, breach of the duty of loyalty, and employee piracy and corporate raiding.

This Memorandum Opinion addresses Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, and Defendants' Motion to Dismiss, ECF No. 10. A hearing was held on November 19, 2014. *See* Loc. R. 105.6. For the reasons stated herein, Plaintiffs' Motion for Preliminary Injunction is DENIED, and Defendants' Motion to Dismiss is GRANTED, in part, and DENIED in part.

## I.    BACKGROUND

### a.  Plaintiffs' Complaint[1]

Plaintiff MedServ International, Inc. ("MedServ") is a Maryland corporation that wholly owns Plaintiffs EndoSurg Medical, Inc. ("EndoSurg") and EndoCure Technologies, Inc. ("EndoCure"), which are also Maryland corporations. ECF No. 2 at ¶¶ 1–3. Endoscopic surgery requires the insertion of a camera or other imaging instrument inside the human body. *Id.* at ¶ 8. MedServ markets endoscopic equipment repair services to hospitals, ambulatory surgery centers, and certain alternative care facilities. *Id.* at ¶ 9. EndoSurg sells, distributes, and repairs endoscope replacement components that are manufactured internally or through outside vendors. *Id.* at ¶ 2. EndoCure manufactures and sells custom rigid and small diameter flexible endoscopes. *Id* at ¶ 3.

MedServ and EndoSurg are located at 10727 Tucker Street, Beltsville, Maryland. *Id.* at ¶ 2. EndoCure is located at 6900 Virginia Manor Road, Suite 110, Beltsville, Maryland. *Id.* at ¶ 3. EndoSurg and EndoCure have been in operation for ten years and four years respectively. *Id.* at ¶ 51. EndoSurg has used the following design since 2012:



*Id.* at ¶ 52.

MedServ alleges that it has a unique in-house manufacturing and repair capability that was created through its extensive history in the field. *Id.* at ¶ 10. MedServ's capability

---

[1] For purposes of considering Defendants' Motion to Dismiss, the Court accepts the facts alleged in the Complaint as true.  *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).

distinguishes it in the field of endoscopic and surgical instrument repair. *Id.* To learn their technique, employees of MedServ and its subsidiaries undergo an extensive technician training process, which takes several years to complete. *Id.* at ¶ 11. In the process, the employees gain an understanding of the relevant raw materials and component parts. *Id.* at ¶ 13. Plaintiffs allege that due to the cost, time, and effort it takes to train new technicians, MedServ requires that technicians and managers who undergo the training sign non-compete and confidentiality agreements. *Id.* at ¶ 14. Technicians or managers who have prior experience and do not undergo the training only sign the confidentiality agreement. *Id.*

In addition, MedServ maintains a database of customer information that includes end-user customer lists, field sales representative customer lists, end-user broker customer lists, historical sales data for endoscope repair, historical sales data for endoscope parts, data relative to unique customers, and data concerning specific vendors and manufactures. *Id.* at ¶ 17. To protect this information, MedServ requires that employees sign a confidentiality agreement and that employees confirm, in writing, that the information will be returned upon termination of employment. *Id.* at ¶ 19.

Defendant Leung was the chief technology officer at MedServ. *Id.* at ¶ 22. In that position, he was privy to MedServ's unique in-house manufacturing and repair capability, its training program, and its client information. *Id.* at ¶ 25. According to Plaintiffs, as an employee of MedServ, Defendant Leung was subject to MedServ's terms of employment and terms governing termination, which prohibit the use of client information and require that any information be returned upon termination. *Id.* at ¶ 27.

On May 28, 2013, Defendant Leung formed the company EndoMaster Medical, Inc. ("EndoMaster"), and four months later, on September 17, 2013, resigned from MedServ. *Id.* at ¶

23–24. EndoMaster provides the same repair services as EndoSurg. *Id.* at ¶ 60. EndoMaster is located on the same block as MedServ and EndoSurg at 10739 Tucker Street, Beltsville, Maryland. *Id.* at ¶ 59. The following are two designs that EndoMaster has used:

EndoMaster Medical Inc.



*Id.* at ¶¶ 55–56. According to Plaintiffs, the first design uses a gray color similar to the EndoSurg design, and the second design uses the color blue, uses words in all caps, and places the word "Medical" under EndoMaster similar to the EndoSurg design. *Id.* at ¶¶ 55–56.

After resigning, Defendant Leung hosted an event at his residence to discuss his plans for EndoMaster and invited several technicians of MedServ. *Id.* at ¶ 30. Defendant Leung recruited Defendant Paul Au, who was the inventory and purchasing manager at MedServ, to join EndoMaster. *Id.* at 32. Defendant Cathy Young also joined EndoMaster. *Id.* at ¶ 37. Defendant Young was the national sales manager at MedServ and had extensive knowledge of MedServ's client information, purchase histories, sales data, and marketing techniques. *Id.* Plaintiffs allege that, before joining EndoMaster and while still working for MedServ, Defendant Young attempted to procure government contracts for EndoMaster using a subscription service that MedServ had purchased. *Id.* at ¶ 46. Since joining EndoMaster, Defendant Young has contacted

several of MedServ's customers on behalf of EndoMaster by, according to Plaintiffs, using MedServ's client information. *Id.* at ¶ 41. Plaintiffs also believe that EndoMaster has undergone efforts to confuse customers into believing that EndoMaster is affiliated with MedServ, EndoSurg, and EndoCure by highlighting the names of former MedServ employees in EndoMasters' marketing materials. *Id.* at ¶¶ 61–62. Also, Defendant Young mentions the names of Defendants Leung and Au, who were high-profile employees of MedServ, in her emails. *Id.* at ¶¶ 43–44. Plaintiffs obtained EndoMaster's pricing information, which Plaintiffs believe demonstrates that EndoMaster used EndoSurg's confidential pricing model in an effort to underbid EndoSurg. *Id.* at ¶ 45. Further, Plaintiffs allege that EndoMaster contacted one of MedServ's customers, Paces MedEquip, LLC, and told the customer that MedServ was unstable. *Id.* at ¶ 49. Plaintiffs contend that EndoMaster's wrongful actions have caused MedServ to suffer significant losses from at least four large customer accounts. *Id.* at ¶50.

### b.   Evidentiary Hearing on Plaintiff's Motion for Preliminary Injunction

On November 19, 2014, the Court held an evidentiary hearing to address the Motion for Preliminary Injunction. Mr. Wendell Haight testified on behalf of Plaintiffs. Defendants Leung and Young testified for Defendants.

Haight is the president of MedServ and its subsidiaries. Hearing Transcript ("H. Tr.") at 25, ECF No. 26. In that role, he oversees research, development, and sales operations. *Id.* Haight has been involved in the endoscope industry since 1993 and joined MedServ in 2008. *Id.* at 26. Defendant Leung is the president of EndoMaster. *Id.* at 111. He began his career at an official dealership for Olympus equipment in Japan, where he initially learned how to repair endoscopes. *Id.* at 106. After working there for sixteen years, he came to the United States and worked for MedServ for twenty years. *Id.*   Defendant Young currently works as a sales manager for

EndoMaster. *Id.* at 124. Defendant Young has worked in customer service for a variety of medical equipment servicers since 1992. *Id.* at 124–25. She worked for MedServ from 2009 to 2014. *Id.* at 125.

The parties testified regarding MedServ's repair and training processes. In discussing the training process for new MedServ technicians, Haight explained that the process is tiered and the technicians go from minor repairs to intermediate repairs to major repairs. *Id.* at 26–27.  Haight described major repairs as requiring extensive training and a very specific skill set and said that the process is manufacturer and model specific. *Id.* He explained that MedServ is one of a few organizations in the country that reverse engineers designs and produces replacement components for flexible endoscopes. *Id.* at 29. Haight also testified that MedServ requires unique raw material formulas and specific cases from outside contractors. *Id.* He stated that these processes and raw material formulas are not generally known outside of MedServ. *Id.* at 29–30. To preserve the confidential nature of the processes, according to Haight, MedServ constantly reiterates their confidential nature and requires employees to sign non-compete agreements. *Id.* at 30.

Haight testified that Defendant Leung performed research and development at MedServ, including reverse engineering and design work. *Id.* at 37. According to Haight, Defendant Leung was instrumental in training technicians and was the key supervisor of the technicians. *Id.* at 34. Defendant Leung had access to MedServ's training programs, its reverse engineering designs, and its unique raw material formulas and specific cases. *Id.* Haight also testified that before Defendant Leung resigned, he put in requests for tools that would enable him to dissect endoscopes. *Id.* at 50. Haight testified that Defendant Au was MedServ's material manager and was privy to formulas that MedServ used for specific endoscope components. *Id.* at 40.

Despite Haight's statements regarding the uniqueness of MedServ's repair procedures, he admitted that MedServ's repair process follows industry standards set by the original manufacture (Olympus). *Id.* at 63. Further, Defendant Leung testified that he learned the process of repairing endoscopes at Olympus, and he implemented that procedure at MedServ. *Id.* at 107. He explained that there is a specific protocol required to meet the original equipment manufacturer's specifications. *Id.* at 108–09.

The witnesses also discussed MedServ's customer database. Haight testified that MedServ maintains a customer database that includes customer names, contact information, equipment that MedServ repaired for the customer, customer purchases, and prices that the customer paid. *Id.* at 31–32. MedServ uses this information in a variety of ways, including determining when a particular customer's equipment needs replacement. *Id.* at 32. Haight testified that MedServ keeps this information confidential by having password-protected access and by limiting a sales representative's access to only customers that he or she services. *Id.* at 33–34. About twenty percent of MedServ's employees have access to the customer database. *Id.* at 34. MedServ also performs its marketing services internally to protect the customer database from third parties. *Id.* at 35. Haight testified that Defendant Young was MedServ's national sales manager and was responsible for working with the sales force, recruiting new territories, and soliciting new business. *Id.* at 38. Haight also testified that Defendant Au was MedServ's material manager and was privy to customer database information. *Id.* at 40.

Defendant Leung testified that he found potential customers for EndoMaster through an internet search for endoscope repair companies. *Id.* at 113–14. Defendant Young testified that she did not take any of MedServ's client information when she transitioned to EndoMaster. *Id.* at 139–40. She stated that Defendant Leung provided her with a list of potential customers to call

and that she also searched for potential customers on the internet. *Id.* at 132. She testified that the pool of potential clients is generally well known in the endoscope repair industry because it is a small community. *Id.*

The witnesses also each discussed contracts between MedServ and its employees. Haight testified that there is a policy in the industry for employees to sign non-compete agreements if a company such as MedServ trained the employee. *Id.* at 47–48. However, if an employee comes to MedServ with prior experience, they are not required to sign a non-compete agreement because they will not be learning a new skill set from MedServ. *Id.*[2] According to Haight, there is also an industry policy that all employees sign confidentiality agreements. *Id.*

Defendants Leung and Young testified that they were never asked to sign non-compete or confidentiality agreements. *Id.* at 107–08, 126. Haight admitted that MedServ could not locate any signed non-compete or confidentiality agreements for Defendants Leung, Au, or Young. *Id.* at 75–76. Further, according to Haight, there were four technicians who left MedServ to work for EndoMaster, and MedServ could not locate any signed non-compete or confidentiality agreements for those four technicians. *Id.* at 48. Indeed, Haight indicated that a few current MedServ technicians have not signed non-compete agreements. *Id.* at 81. Defendant Leung testified that when he hired four former MedServ technicians to work at EndoMaster, he first confirmed with them that they did not sign non-compete agreements with MedServ. *Id.* at 118.

Haight also admitted that MedServ could not locate any signed acknowledgment receipts for a MedServ employee handbook—which contains a confidentiality provision—in the personnel files of Defendants Leung, Au, or Young. *Id.* at 66. Defendant Leung testified that

---

[2] For example, Haight has not signed a non-compete agreement. *Id.* at 84. He testified that he believes that as long as he does not solicit MedServ clients, he would be able to leave and compete against MedServ. *Id.* at 85.

MedServ did not have an employee handbook when he began working there, and he was never asked to sign one. *Id.* at 107. Haight testified that Defendant Young received the employee handbook, *id* at 66, but stated that MedServ could not find the signed copy of the Handbook. *Id.* at 73. Defendant Young testified that she was never asked to sign an employee handbook. *Id.* at 126. She further stated that during her employment at MedServ, she was involved in the hiring of a small number of new employees and was never provided with an employee handbook to give to them. *Id.* at 127.

As for the termination agreements, Haight stated and Defendant Young confirmed, that she agreed to sign a termination agreement, but never executed the agreement. *Id.* at 46, 135. The unsigned draft of Defendant Young's termination agreement did not contain a non-compete provision. *See* ECF No. 3-11 at 3–4. Defendant Au did sign a termination agreement, which required the return of MedServ's property. *Id.* at 47.

Haight testified that EndoMaster was using MedServ's confidential information to solicit MedServ's customers and using its name and location to cause customer confusion. He testified that EndoMaster had solicited business from several of MedServ's customers. *Id.* at 52–55. He stated that these customers had contacted him to tell him that EndoMaster, specifically Defendant Young, had contacted them. *Id.* Haight acknowledged that one of the customers was contacting him simply to let him know that Defendant Young was competing with MedServ. *Id.* at 93–94. He stated that one of the customers contacted by EndoMaster was EndoSolutions, a company based in Florida that also repairs endocopes. *Id.* at 90–91. Haight further stated that mail servicers had delivered mail for EndoMaster to EndoSurg because of the similar addresses and names. *Id.* at 55–56.

## II.     DISCUSSION

### a.  Standards of Review

#### i.  Plaintiffs' Motion for Preliminary Injunction

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The grant of a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (*quoting Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted). Thus, the burden placed upon Plaintiffs to state a claim for a preliminary injunction is high. The Supreme Court and the Fourth Circuit recognize four requirements that a party must show to be granted a preliminary injunction:

> (1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest.

*The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010), *citing Winter*, 555 U.S. at 20; *see also Dewhurst*, 649 F.3d at 290 (reaffirming the four requirements). All four requirements must be met in order for a preliminary injunction to be granted. *See Dewhurst*, 649 F.3d at 290.

Merely "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not show a likelihood of success on the merits. *Allstate Ins. Co. v. Warns*, 2012 WL 681792 at *14 (D.Md. Feb. 29, 2012). Further, "[c]ourts have declined to issue a preliminary injunction when there are significant factual disputes." *Chattery Intern.,*

*Inc. v. JoLinda, Inc.*, 2011 WL 1230822 at * 9 (D.Md. Mar. 28, 2011); *see also Torres Advanced Enterprise Solutions, LLC v. Mid-Atlantic Professionals Inc.*, 2013 WL 531215 at * 3 (D.Md. Feb. 8, 2013).

Plaintiffs limit their motion for preliminary injunction to their claims for breach of contract, tortious interference with business relationships, tortious interference with employee relationships, violation of the Maryland Trade Secrets Act, and trademark infringement. ECF No. 3 at 10–17.

### ii.   Defendants' Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to present a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss invoking Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 545 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.").

In evaluating a motion to dismiss, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). Indeed, Rule 12(b)(6)'s purpose "is to test the

sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "Courts cannot weigh the facts or access the evidence at this stage, but a complaint entirely devoid of *any* facts supporting a given claim cannot proceed." *Potomac Conference Corp. of Seventh-day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2 F.Supp. 3d 758, 768 (D. Md. 2014).

Also, in considering a Rule 12(b)(6) motion, the court need not always limit its review to the pleadings. A court may "consider documents incorporated into the complaint by reference, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citations and internal quotation marks omitted). A Rule 12(b)(6) motion should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (citations omitted).

Defendants have moved to dismiss all ten counts of Plaintiffs' complaint. The Court will first address the counts relevant to both Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss before turning to the remaining counts.

### b.  Breach of Contract (Count 1)

### i.  Plaintiffs' Motion for Preliminary Injunction

To prove breach of contract under Maryland law, Plaintiffs must present evidence of a contractual obligation owed by the Defendants to the Plaintiffs and a breach of that obligation by the Defendants. *See RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655, 994 A.2d 430, 440 (Md. 2010) (internal citation and emphasis omitted). Plaintiffs argue that they are likely

to succeed on their breach of contract claims because Defendants were required to adhere to the confidentiality statement in the employee handbook and the termination agreements promising to return confidential information. ECF No. 3 at 11–12. They argue that Defendants breached these agreements by taking Plaintiffs' customer information to contact customers, suppliers, and vendors of Plaintiffs. *Id.* at 12.

During the November 19, 2014 hearing, Plaintiffs' corporate representative, Haight, testified that MedServ could not locate an employee handbook acknowledgment form for the three defendants. H. Tr. at 66, 75–76. Defendants Leung and Young testified that they never received or signed an employee handbook. *Id.* at 107, 126. Under these facts, Plaintiffs' allegations of these agreements have gone unsubstantiated. Thus, Plaintiffs are unlikely to succeed in proving that Defendants entered into confidentiality agreements with MedServ.

Even if the Defendants had entered into confidentiality agreements and those agreements were enforceable, Plaintiffs have failed to present evidence to show a breach of those agreements or the termination agreements (which required the return of MedServ property). Plaintiffs point to Defendants' solicitation of former MedServ clients. Yet, this does not demonstrate a breach. Contacting or advertising to a former employer's customers, without more, fails to demonstrate the use of confidential information. Defendant Young provided unrefuted testimony that she did not use confidential information to contact other clients, rather, the pool of potential clients in the community of endoscope repair companies is small and generally well-known. ECF No. 26, H. Tr. at 132. Additionally, Defendant Young testified that she did not solicit any customer with whom she developed a relationship while at MedServ. *Id.* at 138. Defendants Leung and Young both testified that they advertised and contacted potential clients after finding names of potential clients on the internet. *Id.* at 113–14, 132. Defendants' actions, as presented to the Court, do not

indicate use of confidential client information. Additionally, there is no evidence that Defendants did not return property or otherwise breached the termination agreement. Without evidence, Plaintiffs have not provided the Court with adequate support to find that Plaintiffs are likely to succeed on their breach of contract claim. With regard to this claim, Plaintiffs' Motion for Preliminary Injunction is DENIED.

### ii.  Defendants' Motion to Dismiss

To state a claim for breach of contract under Maryland law, the complaint must ". . . allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *RRC Northeast, LLC*, 413 Md. at 655, 994 A.2d at 440 (internal citation and emphasis omitted). For a contract to be legally enforceable, its language must "be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties." *Robinson v. Gardiner,* 196 Md. 213, 217, 76 A.2d 354, 356 (Md. 1950). In considering the sufficiency of a complaint alleging breach of contract, "any ambiguity or uncertainty in the allegations is to be construed against the pleader." *Carder v. Steiner*, 225 Md. 271, 276, 170 A.2d 220, 222 (1961), *overruled on other grounds*. Further, "skeletal factual allegations accompanied by nothing more than mere conclusions and general averments of a breach of a contractual duty do not suffice to establish [a] . . . unique and sophisticated claim." *Continental Masonry Co., Inc. v. Verdel Const. Co., Inc.,* 279 Md. 476, 481, 369 A.2d 566, 569 (Md. 1977).

Here, Plaintiffs' Complaint dances around a contractual obligation without actually alleging one. Plaintiffs allege that "[t]he terms of employment and termination of employment between Defendants Leung, Au, Young[,] and MedServ prohibited: (i) disclosure of any client or staff information of MedServ to any third-party; (ii) copying, removal[,] or any other

unauthorized access to MedServ documents, files[,] and mailing lists; (iii) any other form of distribution of client information; and (iv) failure to return proprietary information to MedServ upon resignation." ECF No. 2 at ¶ 65. Plaintiffs also allege that "it is MedServ's corporate policy that technicians and managers who undergo the MedServ Training Protocol must execute a non-competition and a confidentiality agreement with MedServ . . . Technicians and managers with extensive prior experience who do not undergo the MedServ Training Protocol must still sign a confidentiality agreement." *Id.* at ¶ 14. Further, the Complaint contains allegations that the MedServ employee handbook contains confidentiality provisions, that employees confirm in writing that they will follow these provisions, and that employees confirm in writing that they will return all customer information upon termination of employment with MedServ. *Id.* at ¶ 19. The Complaint states that "Defendant Leung was subject to terms of employment and terms governing termination of his employment which prohibited use of the Client Information and which required all proprietary information of MedServ to be returned upon Defendant Leung's resignation." *Id.* at ¶ 27. Finally, the Complaint explains that the employees resigned from MedServ for employment at EndoMaster and used MedServ's confidential client information to further EndoMaster's business. *Id.* at ¶¶ 28, 32–33, 41.

Notably missing from the Complaint, however, is an allegation that the named Defendants entered into an agreement with Plaintiffs.[3] Although the Complaint states that MedServ had a policy of having employees sign these agreements, Plaintiffs do not allege that Defendants Leung, Au, or Young ever verbally entered into or signed a non-compete agreement or an employee handbook with the confidentiality statement. The closest thing to a contract that

---

[3] Evidence elicited at the hearing provides the Court with some indication as to why Plaintiffs do not (or cannot) allege actual agreements, but for the purposes of the Motion to Dismiss, the Court is only considering the allegations in the Complaint.

the Complaint alleges is that Defendants were "subject to terms of employment," but this does not allege the existence of a contract. Though Plaintiffs have cleverly worded their allegations, the allegations are void of any facts showing an offer and acceptance. Thus, they fail to allege the existence of a contract. Whether Defendants took part in Plaintiffs' general policy of requiring a contract is an ambiguity in the Complaint that the Court will construe against the pleader. When the Court questioned Plaintiffs' counsel on the existence of a contract, counsel simply reiterated that such agreements were company policy. H. Tr. at 166, ECF No. 26. Plaintiffs have failed to allege that Defendants had a contractual obligation to Plaintiffs. *See Tessler v. Nat'l Broacasting Co., Inc.*, 364 Fed. Appx. 5, 7 (4th Cir. 2010) (affirming dismissal for breach of contract because plaintiff failed to allege that she accepted defendant's offer); *see also Wolverine Const., Inc v. Argonaut Ins. Co.*, 2013 WL 5727018 at *3  (D.Md. Oct. 18, 2013) (finding facts for breach of contract claim were not alleged with certainty and definiteness where complaint referred to a bonding capacity agreement but did not otherwise offer any details of the nature, terms, or timing of the contract); *Gorby v. Weiner*, 2014 WL 4825962 at *8 (D.Md. Sept. 23, 2014) (finding facts constituting breach of contract claim were not alleged with certainty and definiteness where plaintiff alleged that the parties  agreed to be co-owners of a company because the allegation did not explain any of the terms of the agreement such as the obligations of the parties or the length of the agreement). Plaintiffs' breach of contract claim is DISMISSED.

### c.  Tortious interference with employment relationships (Count 2)

### i.  Plaintiffs' Motion for Preliminary Injunction

"Tortious interference with an existing contract has long been recognized as a cause of action in Maryland." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (Md.

Ct. Spec. App. 1991) (*citing Gore v. Condon,* 87 Md. 368, 376, 39 A. 1042 (1898)).[4] To prove

tortious interference with a contract, a plaintiff must show (1) the existence of a contract between

plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional

interference with that contract; (4) breach of that contract by the third party; and (5) resulting

damages to the plaintiff. *Id.* As to element three, regarding the defendant's interference,

Comment i to § 768 of the Restatement Second of Torts explains that "[a]n employment contract

. . . may provide that [the employee] is under a continuing obligation not to engage in

competition with his former employer. Under these circumstances[,] a defendant engaged in the

same business might induce the employee to quit his job, but he would not be justified in

engaging the employee to work for him in an activity that would mean violation of the contract

not to compete." Thus, a defendant intentionally interferes with a non-compete agreement if he

or she knowingly engages the employee to work in an activity that would constitute violation of

the non-compete agreement. *Fowler*, 89 Md. App. at 470, 598 A.2d at 804.

Plaintiffs contend that Defendant Leung committed tortious interference with Plaintiffs'

employment relationships because he knew that MedServ technicians Chan, Wu, and Huang had

signed non-compete agreements and, nonetheless, hired them as technicians for EndoMaster.

ECF No. 3 at 13. However, MedServ's president testified that MedServ could not locate the non-

compete agreements for the former MedServ technicians who joined EndoMaster. H. Tr. at 48.

Further, Defendant Leung testified that he only hired former MedServ employees after

confirming with the employees that they did not have non-compete agreements with MedServ.

*Id.* at 118. Once again, the lack of any evidence of a contract is the death knell to Plaintiffs'

claim. Under the evidence presented, Plaintiffs are unlikely to succeed in proving that Defendant

---

[4] Although the Plaintiffs entitled this claim as interference with employment relationships, the
content of the count shows that it is a claim for interference with a contract.

Leung knew of any agreements and engaged former MedServ technicians in activities that would violate the agreements. Plaintiffs' Motion for Preliminary Injunction for tortious interference with employment contracts is DENIED.

### ii. Defendants' Motion to Dismiss

In their Complaint, Plaintiffs allege that Defendant Leung was aware of the relationship MedServ had with its employees, including the existence of non-compete agreements. ECF No. 2 at ¶¶ 70–71. Plaintiffs assert that Defendant Leung induced several employees to terminate their employment with MedServ to work for EndoMaster and to use confidential information acquired during their employment at MedServ. *Id.* at ¶ 72. Specifically, Plaintiffs allege that Defendant Leung hosted an event at his residence to discuss his plans for EndoMaster with various MedServ technicians. *Id.* at ¶ 30. MedServ employees Au and Defendant Young joined EndoMaster. *Id.* at ¶¶ 32, 41, 73. Additionally, MedServ technicians Chan, Wu, and Huang joined EndoMaster. *Id.* at ¶ 73.

In the absence of a non-compete agreement, as Defendants contend, a former employee is permitted to solicit other employees of his or her former employer. *See Ritterpusch v. Lithographic Plate Serv.*, 208 Md. 592, 600 (1956). Defendants also correctly note that employees may discuss job offers and debate whether to leave together without disclosing it to the employer. *See Weichert Co. of Md. v. Faust*, 419 Md. 306, 339 n.11 (2011). Here, Plaintiffs allege that it was MedServ's policy for employees to enter into non-compete agreements with employees. ECF No. 2 at ¶ 71. However, Plaintiffs have failed to allege that Defendants Au and Young, or technicians Chan, Wu, or Huang entered into non-compete agreements with MedServ. Thus, as with the breach of contract claims, Plaintiffs have failed to allege that its former employees had a contractual obligation to plaintiffs. Without adequately pleading the existence

of a non-compete agreement, Plaintiffs have failed to properly allege tortious interference with an employee contract and this claim is DISMISSED.

### d. Tortious interference with actual and prospective business relationships (Count 3)

#### i. Plaintiffs' Motion for Preliminary Injunction

Wrongful interference with economic relationships can occur when one party (1) performs an intentional and willful act (2) that is calculated to cause damage to another party's business (3) that is done with the unlawful purpose of causing that damage without right or justifiable cause and (4) that causes damages. *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 650, 650 A.2d 260, 268 (Md. 1994). However, as "self-interested commercial dealing has its proper place in the business world," *id.* at 653, 650 A.2d at 269, tortious or wrongful interference requires both tortious intent and wrongful conduct. *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 301, 639 A.2d 112, 119 (Md. 1994). Wrongful or unlawful interference would include, for example, interfering with economic relationships through acts of "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander & Alexander Inc.*, 336 Md. at 657, 650 A.2d at 271 (*citing K&L Management v. Lee*, 316 Md. 137, 166, 557 A.2d 965, 979 (Md. 1989)) (internal quotation marks omitted).

Of the above wrongful ways one can interfere with a business relationship, Plaintiffs argue that Defendants made a false statement about MedServ to its customers. To show that a defendant committed an injurious falsehood, a plaintiff must establish that the defendant acted with malice in publishing a known falsity that caused special damages. *Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*, 189 F.Supp. 2d 271, 277 (D.Md. 2001). Plaintiffs must

establish that the disparaging statement was a falsity. *Beane v. McMullen*, 265 Md. 585, 608, 291 A.2d 37, 49 (Md. 1972). Plaintiffs contend they will likely prove that, to take business from Plaintiffs, Defendants made the false claim that MedServ was "unstable" and that its products were of a lower quality. The Court is left to wonder, however, whether Defendants' alleged statement is false because Plaintiffs have failed to provide evidence showing that MedServ is stable. To the contrary, evidence at the hearing suggested declining business and loss of employees. *See* H. Tr. at 110, ECF No. 26 (Defendant Leung testified that MedServ started layoffs in 2013); *Id.* at 129 (Defendant Young testified that MedServ had seen a decline in 2013). Although discovery may strengthen this count, on this record, the Court is not able to find that Plaintiffs are likely to succeed on their claim for tortious interference with business relationships. Plaintiffs' Motion for Preliminary Injunction with regard to tortious interference with business relationships is DENIED.

### ii.  Defendants' Motion to Dismiss

Plaintiffs state in their Complaint that Defendants were aware of MedServ, EndoSurg, and EndoCure's business relationships and clientele. ECF No. 2 at ¶ 78. Plaintiffs allege that Defendants have improperly interfered with those relationships by using confidential client information to attempt to cause businesses to cease their relationships with MedServ and its subsidiaries. *Id.* at ¶¶ 79–80. Plaintiffs also claim that Defendants used a name and address similar to Plaintiffs to confuse customers. *Id.* at ¶ 81. Finally, Plaintiffs assert that Defendants misrepresented the quality of Plaintiffs' services and products in an attempt to cause businesses to cease their relationships with MedServ and its subsidiaries. *Id.* at ¶ 82. Specifically, Plaintiffs allege that Defendants contacted one of Plaintiffs' clients and told the client that MedServ was "unstable." *Id.* at ¶ 49.

Defendants assert that none of the alleged acts qualify as the wrongful conduct required for a finding of tortious interference. ECF No. 10 at 21. Defendants further contend that the alleged acts simply show self-interested commercial dealing and business competition, which does not qualify as wrongful conduct. *Id.* at 22–23. To the contrary, misrepresentation of the quality of Plaintiffs' services by calling Plaintiffs' businesses "unstable" may qualify as an injurious falsehood or defamation, if indeed it is shown to be a misrepresentation. *See Equis Corp. v. Staubauch Co.*, 2000 WL 283982 at * 1 (N.D. Ill. March 13, 2000) (finding plaintiff's complaint for tortious interference survived a motion to dismiss because plaintiff alleged that defendant told one of plaintiff's customers that plaintiff was financially unstable and whether such allegations would result in a "winning claim" was a separate question from whether it passed a motion to dismiss). Thus, count three of Plaintiffs' Complaint states a claim for tortious interference with economic relationships.

### e.  Violation of the Maryland Uniform Trade Secrets Act (Count 4)

### i.  Plaintiffs' Motion for Preliminary Injunction

The Maryland Uniform Trade Secrets Act ("MUTSA") provides statutory remedies for a business alleging misappropriation of a trade secret. *LeJune v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 849 A.2d 451, 459 (Md. 2004). "Misappropriation" means the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."[5] Md. Code, Commercial Law Article ("CL") § 11-1201(c). "Trade secret" means:

---

[5] Misappropriation also is:
Disclosure or use of a trade secret of another without express or implied consent by a person who:
    (i) Used improper means to acquire knowledge of the trade secret; or

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md Code, CL § 11-1201(e).

Processes and methods can qualify as trade secrets. *See Space Aero Products Co. v. R.E. Darling Co.*, 238 Md. 93, 105–12, 208 A.2d 74, 79–84 (Md. 1965). Further, customer lists are not categorically included or excluded from being trade secrets. *Compare Fulton Grand Laundry Co. v. Johnson*, 140 Md. 359, 361, 117 A. 753, 753 (Md. 1922) (finding customer list was not trade secret where the list was "susceptible of discovery by observation [and] open to the observation of any one who [thought] it worth while to observe.") *with Padco Advisors, Inc. v. Omdahl*, 179 F.Supp. 2d 600, 603 (D. Md. 2002) (denying summary judgment where plaintiff had shown client list could reasonably be considered a trade secret where certain information on the database was not ascertainable by competitors, the information had economic value because it could help develop new products, and the database was available to only 15% of its employees and protected by passwords and firewalls). Thus, processes and customer databases can qualify

---

> (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>> 1. Derived from or through a person who had utilized improper means to acquire it;
>> 2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>> 3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. Md. Code, CL § 11-1201(c).

as trade secrets if they meet the statutory definition of a trade secret by holding independent economic value and being the subject of reasonable efforts to maintain its secrecy. *See* Md. Code, CL § 11-1201(e).

Here, Plaintiffs state that MedServ's customer list derives independent economic value from not being generally known or readily ascertainable by third-parties and it is subject to reasonable efforts to maintains its secrecy. ECF No. 3 at 11. Plaintiffs go on to allege that Defendants Leung, Au, and Young had access to this information and had a duty to maintain its secrecy. *Id.* When arguing its motion for preliminary injunction, Plaintiffs contended that EndoMaster's advertising shows that it misappropriated MedServ's repair and training processes and client information. H. Tr. at 7–9, ECF No. 26. Plaintiffs noted that EndoMaster advertised (1) that their repair protocol has been developed by experts in the industry and has been proven over the past twenty-five years; (2) that EndoMaster developed extensive computer generated reports that provide detailed information of customer repair history; and (3) that EndoMaster's service technicians have been hand selected because of their extensive background and EndoMaster continues to update the technicians' technical skills through scope specific design training classes. *Id.* Plaintiffs contend that these advertisements show that EndoMaster is using MedServ's processes and client information because EndoMaster has not been in the business long enough to develop its own proven methods, customer reports, and training. *Id.* at 7–8. The failing of Plaintiffs' preliminary injunction motion, however, is Plaintiffs' apparent inability to demonstrate that Defendants actually have used or are using their trade secrets. Defendant Leung testified that his training and expertise in the field pre-dates his work at MedServ. H. Tr. at 106–07. Defendants Leung and Young testified that they did not use Plaintiffs' customer list, and at this juncture, it does not appear likely that Plaintiffs will prove the contrary. While discovery has

the potential to paint a different picture, on the evidence before the Court, Plaintiffs are not likely to succeed on the merits.[6] Plaintiffs' motion for preliminary injunction for violation of the MUTSA is DENIED.

### ii. Defendants' Motion to Dismiss

In their Complaint, Plaintiffs allege that MedServ maintains a database of customer information that includes end-user customer lists, field sales representative customer lists, end-user broker customer lists, historical sales data for endoscope repair, historical sales data for endoscope parts, data relative to unique customers, and data concerning specific vendors and manufactures. ECF No. 2 at ¶ 17. Plaintiffs allege that this information is not generally known, ascertainable, or capable of duplication. *Id.* at ¶ 16. According to Plaintiffs, this list was only available to a limited number of employees. *Id.* at ¶ 18. Plaintiffs allege that the database of client information would be valuable to any of MedServ's competitors. *Id.* at 21. To protect this information, Plaintiffs assert, MedServ requires that employees sign a confidentiality agreement and that employees confirm, in writing, that the information will be returned upon termination of employment. *Id.* at ¶ 19. Plaintiffs allege in their Complaint that Defendants violated the MUTSA by disclosing and using customer information and other proprietary knowledge and by using techniques discovered in connection with MedServ trainings. *Id.* at ¶ 87–88.

Considering all well-pled allegations in the complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268 (1994), and construing all factual allegations in the light most favorable to Plaintiffs, s*ee Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999), Plaintiffs

---

[6] Plaintiffs will also need to show that MedServ's repair protocol is a trade secret considering Haight's testimony that Defendant Leung, who had experience prior to employment with MedServ, was vital in implementing MedServ's repair protocol and Defendant Leung's testimony that the process throughout the industry is the same. *See* H. Tr. at 60, 103–05, ECF No. 26 (testifying that compliance with manufacturer standards requires similar protocols).

have pled a plausible claim for violation of the MUTSA. Plaintiffs' customer list has economic value because, according to Plaintiffs, it is, among other things, a compilation of customer preferences, it was not generally available to the public, and it was kept secret. Further, Plaintiffs adequately allege that Defendants disclosed and used customer information, repair methods, and training processes. Defendants' Motion to Dismiss is DENIED as to this count.

### f. Lanham Act – Unfair Competition (trademark infringement) (Count 5) and Maryland Trademark Infringement (Count 7)

#### i. Plaintiffs' Motion for Preliminary Injunction

Under 15 U.S.C. § 1125(a)(1)(A),

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

This provision of the Lanham Act protects consumers "from being misled by the use of infringing marks" and protects producers "from unfair practices by an imitating competitor." *Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 428 (2003) (internal quotation marks omitted). It protects against trademark infringement even if the mark is not federally registered. *Perini Corp. v. Perini Const.*, 915 F.2d 121, 124 (4th Cir. 1990). To prove unfair competition based on product infringement under the Lanham Act, a plaintiff must show:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

*Potomac Conference Corp. of Seventh-day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2 F.Supp. 3d 758, 768 (D.Md. 2014) (*citing People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)).

Distinctiveness is the key to whether Plaintiffs possess a protected mark. *Id.* at 769. Varying levels of distinctiveness have been recognized including generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* A generic mark merely employs "the common name of a product or service." *Sara Lee Corp. v. Layser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996). A generic mark is ineligible for trademark protection, *Ale House Management, Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir. 2000), otherwise, one business could trademark a general product name and foreclose other businesses from referencing that name. For example, protection of a generic mark could lead to a company "being forbidden to describe a [vehicle] as a 'car' or an 'automobile' because [another company] had trademarked these generic words." *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535, 538 (4th Cir. 2004). Other examples of generic marks are bleach, copies, and cigarettes. *George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009).

A descriptive mark describes a particular characteristic of a product in a way that does not require any use of the imagination. *Id.* Some examples are "5 minute glue," *id*, and "Sportscreme." *See Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 216 (2nd Cir. 1985). A descriptive mark is eligible for protection only if it has established a secondary meaning, in other words, customers understand that the mark refers to a particular business and not simply to what the descriptive word ordinarily describes. *Perini Corp.*, 915 F.2d at 124–25. A secondary meaning exists when the primary significance of a name is that it identifies the source of the product not the product itself. *Sara Lee Corp.*, 81 F.3d at 464. Using an abbreviation of a

descriptive term does not automatically mean the term has a secondary meaning. If the abbreviation still simply conveys to the buyer a description of the product, it will be considered descriptive only. *George & Co. LLC*, 575 F.3d at 394–95; *see G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 997 (7th Cir. 1989) (finding that the initials LA did not *suggest* the words "low alcohol," they directly described them).

Suggestive marks are eligible for protection. *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 369 (4th Cir. 1999). A mark is suggestive if it "stands for an idea which requires some operation of the imagination to connect it with the goods[.] . . ." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). "The strength of the mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (internal quotation marks and citation omitted). Examples of suggestive marks are Coppertone®, Orange Crush®, and Playboy®. *George & Co. LLC*, 575 F.3d at 394.

A fanciful mark is eligible for protection and is typically a made-up word created to serve as the trademark. *Sara Lee Corp.*, 81 F.3d at 464. For example, Clorox®, Kodak®, Polaroid®, and Exxon® are fanciful marks. *George & Co. LLC*, 575 F.3d at 394. Finally, arbitrary marks are protected marks, and typically involve a common word that has no connection to the actual product. *Id.* Examples are Camel® cigarettes and Apple® computers. *Id.*

When determining whether a mark is protected, courts look at the mark as a whole, not at its individual components. *Internat'l Bancorp, LLC v. Societe Des Baunes De Mer Et Du Cercle Des Estrangers A Monaco*, 192 F.Supp. 2d 476, 480 n.26 (E.D. Va. 2002) (*citing Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988)); *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985). EndoSurg Medical, Inc. and

EndoCure Technologies, Inc. are suggestive marks because they stand for ideas—endoscopes, surgery, curing, medical, and technologies—that require a consumer's imagination to connect them with the making and repairing of endoscopes used in surgery. As with the term Coppertone®, where a consumer must use their imagination to connect a reddish-brown color with sunscreen, here, a consumer must use their imagination to connect EndoSurg Medical, Inc. or EndoCure Technologies, Inc. to the manufacturing and repairing of endoscopes used in surgery.

Defendants contend that "endo" is a generic term because it is associated with myriad other services and consumers are not likely to automatically associate "endo" with endoscopes. ECF No. 10-1 at 27. Had Plaintiffs' name simply been Endoscopes, or Endo, the Court would have likely found the term to be generic. *Cf. George & Co. LLC*, 575 F.3d at 394 (providing that bleach, copies, cigarettes, and cars are examples of generic marks). Had the name been Endoscope Manufacture and Repair, the Court would have likely found the term to be descriptive. *Cf. Thompson Med. Co., Inc.*, 753 F.2d at 216 (finding that "Sportscreme" is a descriptive mark because "no exercise of the imagination is necessary for the public to understand that the product is a cream useful in connection with sports"). However, the names EndoSurg Medical, Inc. and EndoCure Technologies, Inc. provide the consumer with "no way of knowing what is being sold without using their imagination or taking further steps to investigate the products and services." *See* ECF No. 13 at 24. Thus, these marks are suggestive and are eligible for protection under the Lanham Act.

After determining that a plaintiff's mark is eligible for protection, courts look at both plaintiff's and defendant's mark to see if there will be a likelihood of confusion among customers as to the source of the goods or services in question. *Perini*, 915 F.2d at 124. The

Fourth Circuit has identified at least nine factors for courts to consider when determining whether there will be a likelihood of confusion: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *See Pizzeria Uno Corp.,* 747 F.2d at 1527 (setting forth factors one through seven); *see also Sara Lee Corp.,* 81 F.3d at 463–64  (identifying factors eight and nine). Not every factor needs to be equally emphasized in determining the likelihood of confusion. *Pizzeria Uno Corp.*, 747 F.2d at 1527.

To determine if Plaintiffs are likely to succeed in showing a likelihood of confusion, the Court will first look at the strength of Plaintiffs' mark. A suggestive mark can still be found to be weak under the likelihood of confusion prong. *Petro Shopping Centers, L.P.*, 130 F.3d at 93. This is because the strength of the mark depends on the "degree to which the designation is associated by prospective purchasers with a particular source." *Id.* (citation omitted). The combination of two generic or descriptive terms typically results in a relatively weak mark. *See, e.g., Air Products, Inc. v. Marquette Mfg. Co.*, 301 F.2d 348, 349–50 (C.C.P.A. 1962) (finding prefix "Redi-" was used only as a descriptive term by both companies and lacked distinctiveness); *Servo Corp. v. Servo–Tek Prod. Co.,* 289 F.2d 955, 956 (C.C.P.A. 1961) (descriptive prefix "servo" not accorded great weight in determining similarity of marks). Moreover, frequent use of a generic or descriptive word for many different kinds of goods weakens the mark. *Pizzeria Uno Corp.*, 747 F.2d at 1531 (*citing Arrow Distilleries, Inc. v. Globe Brewing Co.*, 117 F.2d 347, 351 (4th Cir. 1941)) (explaining that there was no likelihood of

confusion in use of the word arrow because "arrow" was registered ninety-eight times for various companies); *Air Products, Inc.*, 301 F.2d at 349–50 (explaining that prefix "Redi-", used in both names, was used in other registered marks for various goods).  Defendants, albeit in their motion to dismiss, provide a list of seventeen businesses whose names begin with "Endo" that are currently registered with the Maryland Department of Assessments and Taxation. ECF No. 10-1 at 27 n.10.  Because Plaintiffs' mark combined two generic words (Endo+Surg; Endo+Cure) and "Endo" is used by many other business, Plaintiffs' mark is weak and this factor does not weigh in favor of finding a likelihood of confusion.

As to the similarity of the two marks, this factor weighs heavily against Plaintiffs. When considering the similarity between marks, courts look, in part, at whether there is a similarity in appearance, sound, and meaning which would result in confusion. *Pizzeria Uno Corp.*, 747 F.2d at 1534. In *Medi-Flex, Inc. v. Nice-Pak Products, Inc.*, 422 F.Supp. 2d 1242, 1249–50 (D. Ka. 2006), the district court examined the similarities between the two marks "Chloraprep" and "Chlorasrub." The court noted that the words were similar in sight and sound in that they both began with the prefix "chlora." *Id.* However, the court also observed that the second words, "prep" and "scrub" did not sound alike and the packaging of the two products did not look alike. *Id.*  As to meaning, the court explained that "chlora" indicates that the products contain chlorine. *Id.* However, the suffixes conveyed different meanings, namely, preparing and scrubbing. *Id.* After this review, the court explained that the common prefix "chlora" was the only commonality between the two marks and did not support a finding of similarities between them. *Id.* at 1250. *See also Am. Cyanamid v. Connaugh Labs, Inc.*, 800 F.2d 306, 308–09 (2nd Cir. 1986) (finding HIB-IMUNE and HibVAX were not similar after removing the generic term "hib," which referred to Haemophilius influenza type b diseases, because the suffixes were

different in sound, appearance, and length). Indeed, "[a] trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term." *Id.* at 308.

In this case, the Court can certainly note, from its own observations, that the names sound similar in that they begin with the prefix "Endo" and look similar in that the word attached to "Endo" is capitalized: "Surg," "Cure," and "Master," respectively. The Court also observes that Medical, Inc. is the final phrase in both EndoSurg Medical, Inc. and EndoMaster Medical, Inc. Like in *Medi-Flex, Inc.* and *Am. Cyanamid*, the prefix "endo" is used here as a generic prefix for the word "endoscope." Looking at the suffixes "Surg," "Cure," and "Medical," they are not similar in sight or sound and have different meanings. Further, although Plaintiffs contend that EndoSurg's logo is similar to the two logos created for EndoMaster, the Court finds that these logos are dissimilar and are unlikely to be confusing. EndoSurg's logo contains three small gray and light blue circles next to the words ENDOSURG MEDICAL in gray. EndoMaster's logos are visually very different: one simply says EndoMaster Medical, Inc. against a gray background and the other has a picture of what appears to be an endoscope on a dark blue background with ENDOMASTER MEDICAL, INC. underneath the picture. On the record before the Court, although the names are similar in the use of the prefix "Endo" and capitalization of the letter after "Endo," Plaintiffs cannot appropriate the generic term "endo" for their exclusive use. In fact, the president of MedServ noted that one of its customers used the name  EndoSolutions. H. Tr. at 90–91. Without endo, the marks are not similar enough for the Court to determine that the Plaintiffs have shown that they are likely to succeed in proving a likelihood of confusion among customers.

Factors three and four—the similarity of the goods or services that the marks identify and the similarity of the facilities used by the markholders—weigh in Plaintiffs' favor because the parties agree that the companies are in the business of manufacturing and repairing endoscopes and one of Plaintiffs' business is on the same block as Defendants' business.

As to the fifth factor to consider, the similarity of advertising used by the markholders, the Court has not been presented with advertisements to compare.[7] As such, the Court does not know the types of advertising used by Plaintiffs and Defendants. In the absence of evidence, this factor weighs against finding that Plaintiffs will likely succeed in showing a likelihood of confusion. *Cf. YellowBrix, Inc. v. Yellowbrick Solutions, Inc.*, 181 F.Supp. 2d 575, 580 (E.D. N.C. 2001) (comparing website typeface, bannerhead, and layouts in determining if advertising was similar).

Defendants' intent, the sixth factor to consider, is an important factor in establishing likelihood of confusion. *Pizzeria Uno*, 747 F.2d at 1535. Plaintiffs contend that Defendants' intentions were to cause confusion given their status as former employees, their use of the word endo in their name, and their business location on the same block. ECF No. 3 at 17. A second comer to the market is to name its product so to avoid confusing consumers with the first comer's product. *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990). Here, EndoMaster was the new comer and would have been wise to choose a completely different name and a different location. However, Defendants have also distinguished themselves from Plaintiffs in their emails to potential customers. *See* ECF No. 3-8. The Court finds this factor does weigh slightly in Plaintiffs' favor of showing a likelihood of confusion.

---

[7] The Court was presented with an EndoMaster advertisement, which Plaintiffs claim causes confusion because of the description of the business practices but not because of the markings or similarity to Plaintiffs' advertisements. *See* H. Tr. 156–57.

Evidence of actual confusion is "often paramount" in the likelihood of confusion analysis. *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir. 2001); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 937 (4th Cir. 1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"). Plaintiffs argue that some of their clients and venders, and EndoSurg's accountant, have reported actual confusion about the affiliation between Defendants' EndoMaster and Plaintiffs' EndoSurg and EndoCure. ECF No. 3 at 16–17. Plaintiffs have presented one email to show actual confusion. Specifically, a representative of ConMed Canada sent an email attaching an EndoMaster price list and wrote, "[h]ere is some intelligence info on a call I got this morning from a lab in Baltimore…not yours is it?" ECF No. 3-10. The president of MedServ testified that in addition to this customer, three other customers reached out to him. *See* H. Tr. at 52, ECF No. 26. EndoSolutions asked him if his company had changed its name. *Id.* Another Company, MedEquip, called him to say that EndoMaster had contacted MedEquip and had said that MedServ was unstable. *Id.* at 52–53. Finally, MedServ's president explained that a representative of MedServ's single largest account contacted him to inform MedServ that EndoMaster had contacted the company. *Id.* at 53. MedServ's president also stated that MedServ's accountant and mail carriers have been confused over the name. *Id.* at 55, 94. Accountants and mail carriers are not the relevant consumer in this case. The two customers who simply informed MedServ of EndoMaster's existence certainly do not believe the entities are affiliated. Further, the statement in the email "[h]ere is some intelligence info on a call I got this morning from a lab in Baltimore…not yours is it?" indicates that the customer did draw a distinction between the two companies and was not confused. *Cf. Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 195 (1st Cir. 1980) (inquiries regarding differences

between products and whether companies were affiliated did not show confusion but indicated that customers had different source in mind). Thus, the Court is faced with one instance of customer confusion. Yet most of the client statements indicate that Plaintiffs' clients understood that EndoMaster was separate from EndoSurg or EndoCure. In fact, the affidavit from MedServ's president states that one customer told him that he had been contacted by a former MedServ technician, who had stated that the technician and several others had resigned from MedServ and joined EndoMaster. *Id.* at ¶ 39–40. Thus, Plaintiffs have provided nominal evidence of actual confusion that fails to convince the Court of a likelihood of success on the merits.

Plaintiffs have provided no evidence that would allow the Court to determine the quality of Defendants' product. As to the sophistication of the consuming public, Defendants argue that "endo" refers to endoscopes and that the sophisticated consumer would expect a manufacturer of endoscopes to use the word endo in its name. ECF No. 11 at 13. Further, Defendants argue, the name EndoMaster is so different from EndoSurg and EndoCure that sophisticated consumers, those employing the services of these companies, would not be confused. *Id.* Indeed, Plaintiffs did not contend that their customers would be confused over whether EndoSolutions, another endoscope repair company, was affiliated with EndoSurg or EndoCure. H. Tr. at 90, ECF No. 26. Further, the testimony established that the customer base is relatively small and the products being sold are sophisticated and innovative, *id.* at 26–27, 133, thus making it likely that customers would recognize EndoMaster as a new player in the field. With the above information, the Court cannot find that Plaintiffs will likely be able to show that those in the market of purchasing and requesting repairs of endoscopes would not distinguish EndoSurg, EndoCure, and EndoMaster.

In weighing the above nine factors, the court finds that only three are in Plaintiffs' favor and, as a whole, the Court is not convinced that Plaintiffs are likely to succeed on the merits of their trademark infringement claims. Because Plaintiffs have failed to show a likelihood of success on the merits as it relates to the counts specified in their Motion for Preliminary Injunction, Plaintiffs are not entitled to a preliminary injunction and their motion is DENIED.[8]

## ii. Defendants' Motion to Dismiss

Although Plaintiffs have failed to show a likelihood of success on their trademark infringement claims, the likelihood of confusion is an "inherently factual issue." *See Petro Stopping Centers,* 130 F.3d at 92. Whether the use of a trademark is likely to confuse a consumer is "frequently a fairly disputed issue of fact on which reasonable minds may differ, and has long been recognized to be a matter of varying human reactions to situations incapable of exact appraisement." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (internal citations and quotation marks omitted). Thus, although a conclusory recitation of the legal elements would not survive a motion to dismiss a claim for unfair competition under the Lanham Act, the claim is otherwise ill-suited for a motion to dismiss. *Potomac Conference Corp. of Seventh-day Adventists*, 2 F.Supp. 3d at 768. Plaintiffs have made more than a conclusory

---

[8] As the Court finds that Plaintiffs are unlikely to succeed on the merits of their claims, they have not met all requirements for a preliminary injunction and the motion must be denied. *See Dewhurst*, 649 F.3d at 290. Nonetheless, the other four elements are intertwined with Plaintiffs' failure to show a likelihood of success on the merits. Although a finding of irreparable harm is undeniable in a trademark case when plaintiff demonstrates unlawful use and likelihood of confusion, here, Plaintiffs have not so demonstrated. *See Potomac Conference Corp. of Seventh-day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2014 WL 857947 at *19 (D.Md. Mar. 4, 2014). Further, the balance of equities and the public interest weigh in Defendants' favor. Courts should promote integrity in an employment relationship while also "fostering free and vigorous competition in the economic sphere." *See Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 38–89, 382 A.2d 564, 568 (Md. 1978). Here, as the Plaintiffs have failed to show a likelihood of success, the balance tips toward fostering competition.

allegation that customers may be confused. Plaintiffs allege that the name and logos are similar, ECF No. 2 at ¶¶ 53–57, that the businesses manufacture and sell the same products, *id.* at ¶¶ 2–4, that EndoSurg and EndoMedical are located on the same block, *id.* at ¶¶ 58–59, and that vendors have actually been confused as to whether the businesses are affiliated. *Id.* at ¶¶ 43, 60. Thus, although Plaintiffs have not shown a likelihood to succeed on the merits with the evidence presented at this time, Plaintiffs have sufficiently pled a viable claim against Defendants for unfair competition under the Lanham Act.[9]

### g. Defendants' Motion to Dismiss - Lanham Act – false and misleading statements of fact (Count 6)

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides for two distinct causes of action: "product infringement" and "false advertising." *Resource Developers, Inc. v. Statute of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2nd Cir. 1991). Plaintiffs have filed claims for product infringement, as discussed above, and for false advertising.

Under 15 U.S.C. 1125(a)(1)(B)

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[9] Defendants also move to dismiss Plaintiffs' Maryland common law claim for trademark infringement. ECF No. 10-1 at 29–30. "Infringement of a trademark consists of unauthorized use or colorable imitation of a mark already appropriated by another on goods of similar class." *Mid South Bldg. Supply of Md., Inc. v. Guardian Door and Window, Inc.*, 156 Md. Aoo. 445, 456, 847 A.2d 463, 470 (Md. Ct. Spec. App. 2004). The test for trademark infringement and unfair competition is the same under both the Lanham Act and state law. *Sterling Acceptance Corp. v. Tommark, Inc., d/b/a Sterling Associates*, 227 F.Supp. 2d 454, 460 (D.Md. 2002), *aff'd* 91 Fed. Appx. 880 (4th Cir. 2004). Thus, because the Court finds Plaintiffs have stated a claim under the Lanham Act, it finds the same with regard to the Maryland trademark infringement count.

Under this provision, there are two different theories of recovery for false advertising: an advertisement may be false on its face, or the advertisement may be true, but given the context, likely to mislead or confuse consumers.  15 U.S.C. § 1125(a)(1)(B); *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F.Supp. 2d 708, 713 (D.Md. 2008). To state a claim under this provision, Plaintiffs must allege that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011).

If the representation is literally false, a plaintiff need not show consumer deception to prevail under the Lanham Act. *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). If the advertisement is true, but given the context, likely to mislead or confuse consumers, a plaintiff must also show that the advertisement does tend to mislead consumers. *Id*.

An alleged misrepresentation of fact must be able to be reasonably interpreted as a statement of objective fact. *Metropolitan Regional Information Sys. V. Am. Home Realty Network, Inc.*, 948 F.Supp. 2d 538, 553 (D.Md. 2013) (*citing Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). Statements of fact are capable of being shown true or false in a way that admits of empirical verification. *Presidio Enter., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986). Statements of opinion are generally not actionable under the false advertising provision of the Lanham Act. *See, e.g., Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298, 1311 (11th Cir. 2010); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 496 (5th Cir.2000). Puffery is an exaggerated statement which no reasonable

buyer would be justified in relying on or a claim of superiority so vague that nothing can be understood from it except that it is an opinion. *Pizza Hut*, 227 F.3d at 496–97.

Plaintiffs allege in their Complaint that Defendants told at least one customer that Plaintiffs were unstable.[10] ECF No. 2 at ¶ 49. Shortly thereafter, Plaintiffs allege, they lost that customer's business for a period of time, as well as other large customer accounts. *Id.* at ¶ 50. Defendants appear to challenge whether this statement is a false or misleading statement of fact. ECF No. 10-1 at 31. They contend that, if the Defendants represented that Plaintiffs were "unstable," unstable is a general and subjective term and cannot be considered a false or misleading statement if fact.[11] *Id.* However, the stability of a company can be verified through empirical data and, if Plaintiffs are stable, Defendants' statement would be a false misrepresentation that Plaintiffs allege caused them significant loss of business. *Cf. Polar Corp. v. Coca-Cola Co.*, 871 F.Supp. 1520, 1521 (D. Mass 1994) (granting preliminary injunction under the Lanham Act's false advertising provision where defendant's commercial falsely implied that plaintiff's goods were not pure).

Plaintiffs further allege that Defendants have highlighted Plaintiffs' former employees in their "marketing materials" to create the impression that EndoMaster is affiliated with Plaintiffs. ECF No. 2 at ¶ 61–62. Plaintiffs allege that this will likely mislead consumers as to the source of the goods and services provided by Defendants. *Id.* at ¶ 63. Implying that a product was

---

[10] Defendants do not raise the issue of whether this comment can be considered an "advertisement," but the Court notes that although typically a commercial advertisement is given to the public, depending on the industry, a commercial advertisement can be communication to a limited number of customers. *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996); *see also Nat'l Artists Mngmt. Co. v. Weaving*, 769 F.Supp. 1224, 1234–35 (S.D.N.Y. 1991) (finding Defendant's telephone calls to roughly ten people about reasons for terminating their relationship with plaintiff was commercial advertising).

[11] Defendants also make a perfunctory argument that use of the name EndoMaster was unlikely to deceive customers. ECF No. 10-1 at 32. This argument appears to relate more to Plaintiffs' infringement claim under the Lanham Act and not the false advertising claim.

authorized or approved by a particular person or company may be a form of false advertising if it is likely to mislead consumers. *See Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958). Although Defendants' advertising may be a true representation of fact, it could mislead consumers to believe Plaintiffs and Defendants are affiliated. The Court finds that, at this early stage of the litigation, Plaintiffs' allegations that Defendants advertised Plaintiffs as unstable and highlighted MedServ's former employees in its advertisements are sufficient to state a clam of material misrepresentations in advertisements that injured Plaintiffs.

### h.  Defendants' Motion to Dismiss -  Fraud – (Count 8)

Plaintiffs allege that Defendant Leung committed fraud because he had a duty to but did not disclose that he created EndoMaster, that he intended to launch EndoMaster to compete with Plaintiffs, and that he was going to take Plaintiffs' confidential and proprietary information and use it to compete with Plaintiffs. ECF No. 2 at ¶¶ 108–112. Plaintiffs allege that they relied on Defendant Leung's failure to disclose this information because they did not expect him to launch EndoMaster. *Id.* at ¶ 111.

A claim for fraud is subject to the heightened pleading standard under Fed. R. Civ. P. 9(b), which provides that the claim must be stated with particularity. "Typically non-disclosure does not constitute fraud unless a special duty to disclose exists." *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 566, 843 A.2d 902, 908 (Md. Ct. Spec. App. 2004). A special duty to disclose arises in confidential or fiduciary relationships. *Id.* To sufficiently plead a claim for fraud by concealment, Plaintiffs must allege:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Green v. H & R Block*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (Md. 1999).

Defendants assert that Maryland law permits employees to prepare to compete with their former employers and does not require that employees disclose their intentions to compete after resignation. ECF No. 10-1 at 34. Thus, Defendants contend that Defendant Leung did not commit fraud by omission because he had no duty to disclose that he was preparing to launch EndoMaster. *Id.* Plaintiffs assert that, under Maryland law, an employee has a duty to disclose any information concerning the employment that the employer would likely want to know. *See* ECF No. 13 at 29 (*citing Insurance Co. of North America v. Miller*, 362 Md. 361, 380, 765 A.2d 587, 597 (Md. 2001)) ("One of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know."), *and C-E-I-R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 367, 183 A.2d 374, 379–80 (Md. 1962) (same).

Regardless of whether Defendant Leung had a duty to disclose his alleged intent to misappropriate trade secrets, Plaintiffs have simply stated that they did not expect him to compete with them. They failed to plead that they relied on his concealment and took action based on that reliance. *See Deckelbaum v. Cooter, Mangold, Tompert & Champman, P.L.L.C.*, 292 B.R. 536, 540 (D.Md. 2003) ("Plaintiff's Complaint and Opposition are devoid of any factual allegations from which it could be inferred that the estate or Trustee took any action in reasonable reliance on Defendants' concealment."). Action taken in justifiable reliance on the concealment is an element of fraud by concealment. *See Green v*, 355 Md. at 525, 735 A.2d at 1059. Plaintiffs have failed to state a claim for fraud and count eight is DISMISSED.

### i.   Defendants' Motion to Dismiss - Breach of the duty of loyalty (Count 9)

Under Maryland law, every contract of employment contains an "implied duty that an employee act solely for the benefit of his employer in all matters within the scope of

employment, avoiding all conflicts between his duty to the employer and his own self-interest."
*Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 38, 382 A.2d 564, 568 (Md. 1978) (*citing C-E-I-R, Inc. v. Computer Corp.*, 229 Md. at 366, 183 A.2d at 379); *De Crette v. Mohler*, 147 Md. 108, 115, 127 A. 639, 642 (1925) ("Experience has taught that no man can serve two masters."). However, it is also important to foster competition in allowing employees to "prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty." *Maryland Metals, Inc.*, 282 Md. at 38–39, 382 A.2d at 568–69. Further, once employment is terminated, the employee may solicit his former employer's employees and customers without breaching the duty of loyalty unless he does so through "misuse of his former employer's trade secrets or confidential information." *Id.* at 38, 382 A.2d at 568. Thus, the privilege to prepare to compete is not absolute. An employee may be liable for breach of fiduciary duty if they commit a fraudulent, unfair, or otherwise wrongful act such as misappropriation of trade secrets, conspiracy to bring about mass resignation of key employees, or interference with an employer's business opportunities. *Id.* (citations omitted).

Plaintiffs allege that Defendant Leung breached his duty of loyalty to the company by creating EndoMaster while he was acting as MedServ's chief financial officer and using Plaintiffs' confidential and proprietary information to compete with Plaintiffs. ECF No. 2 at ¶ 115–17. Defendants argue that Plaintiffs have failed to state a claim for breach of the duty of loyalty because Defendant Leung was permitted to open a competing business without breaching the duty of loyalty. ECF No. 10-1 at 34. This argument does not tell the whole story. Even if Leung was permitted to open a competing business, Plaintiffs also allege in their Complaint that Defendant Leung misappropriated trade secrets and interfered with Plaintiffs' business

relationships. *See* ECF No. 2; *supra* Sections 2, 3, 4. As an employee who commits these alleged acts may be liable for breach of the duty of loyalty, Plaintiffs have stated a claim for breach of the duty of loyalty.

### j. Defendants' Motion to Dismiss – Employee piracy/corporate raiding (Count 10)

Plaintiffs allege that Defendants Leung and EndoMaster "engaged in a pattern, practice and scheme of locating and recruiting several key personnel of MedServ in an effort to capitalize upon the business mode, training and experience provided by MedServ to those employees." ECF No. 2 at ¶ 120. Plaintiffs further allege that three of Plaintiffs' technicians, MedServ's National Sales Manager, and MedServ's Inventory and Purchasing Manager left Plaintiffs for EndoMaster. *Id.* at ¶ 121. Plaintiffs also state that Defendants have attempted to use Plaintiffs' customer information and databases. *Id.* at ¶ 123.

Defendants assert that "employee piracy and corporate raiding" is not a cause of action in Maryland. ECF No. 10-1 at 36.  The Court agrees. Indeed, this count is already subsumed in breach of the duty of loyalty—namely, misappropriating trade secrets and conspiracy to bring about mass resignation of key employees is a breach of the duty of loyalty. *See Weichert Co. of Maryland, Inc. v. Faust*, 191 Md. App. 1, 4, 989 A.2d 1227, 1228 (Md. Ct. Spec. App. 2010), *aff'd* 429 Md. 306, 19 A.3d 393 (explaining that plaintiff brought claim for employee piracy and the breach of the duty of loyalty but jury found defendant liable for breach of the duty of loyalty).[12] Count ten is DISMISSED.

---

[12] During oral argument, Plaintiffs' counsel stated: "We have a count in the complaint . . . [i]t's couched as a piracy corporate raiding claim. That's not recognized in Maryland. We'll be happy to amend the complaint to carry out what the intent was, that we are making a claim under the unfair competition law in Maryland." H. Tr. at 167–68, ECF No. 26. Plaintiffs' counsel proceeded to explain the law of unfair competition and a list of factual allegations, which went far beyond those discussed in Plaintiffs' employee piracy/corporate raiding count, that he

### III.    CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, is DENIED. Defendants' Motion to Dismiss, ECF No. 10, is GRANTED, in part, and DENIED, in Part. Counts one (breach of contract), two (tortious interference with employee relationships), eight (fraud), and ten (piracy/corporate raiding) are DISMISSED for failure to state a claim. Counts three (tortious interference with actual and prospective business relationships), four (violation of MUTSA), five (violation of Lanham Act – unfair competition), six (violation of Lanham Act – false and misleading statement of fact), seven (Maryland trademark infringement), and nine (breach of the duty of loyalty) REMAIN. Defendants are instructed to submit their Answer to those counts within the time permitted by the Federal Rules of Civil Procedure.

The Court has gone through great pains to separate its evidence-based rulings on the Motion for Preliminary Injunction from its rulings on the Motion to Dismiss grounded upon the allegations in the Complaint. While the Court is permitting five counts to proceed at this time based on its findings that they have been well-pled, the evidence adduced at the hearing gives the Court serious concern about their merits. While discovery may strengthen Plaintiffs' case, at this juncture, the evidence appears to be at odds with the (sometimes vague) allegations in the Complaint. The Court reminds Plaintiffs of their obligations under Fed. R. Civ. P. 11 and notes that it will think seriously about awarding costs to Defendants if the Court is later convinced that Plaintiffs pursued frivolous litigation designed solely to squelch competition. *Diamond Star*

---

believed constituted unfair competition. *Id.* at 161–62. Undoubtedly, this is not simply a matter of re-naming a count in the complaint. A complaint cannot be amended through oral argument. *Sager v. Housing Comm'n of Anne Arundel County,* 855 F.Supp.2d 524, 557 (D.Md.2012) ("it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation and internal quotation marks omitted).

*Bldg. Corp. v. Freed*, 30 F.3d 503, 506 (4th Cir. 1994) (". . . we note that the goal of deterring a party from pursuing frivolous litigation is furthered by the imposition of attorney's fees and costs . . . .").

     A separate Order shall issue.

Dated: <u>December 19, 2014</u>        <u>        /s/                </u>

                     GEORGE J. HAZEL
                     UNITED STATES DISTRICT JUDGE